**Leila G. BROWN et al., Plaintiffs,**

v.

**John L. MOORE et al., individually and in his official capacity as Probate Judge of Mobile County, Defendants.**

**Civ. A. No. 75–298–P.**

United States District Court,
S. D. Alabama, S. D.

Dec. 9, 1976.

As Amended Dec. 13, 1976.

Gregory B. Stein, J. U. Blacksher and Larry Menefee, Mobile, Ala., Edward Still, Birmingham, Ala., Jack Greenberg, James M. Nabrit, III, and Chas. E. Williams, III, New York City, for plaintiffs.

James C. Wood, Ralph Kennamer, Abe Philips, Mobile, Ala., for defendants.

## OPINION AND ORDER AS TO THE BOARD OF SCHOOL COMMISSIONERS OF MOBILE COUNTY, ET AL.

PITTMAN, Chief Judge.

This is an action brought by Leila G. Brown, and other black plaintiffs representing all Mobile County, Alabama, blacks as a class, claiming the present at-large system of electing county commissioners and school commissioners abridges the rights of the County's black citizens under the First, Thirteenth, Fourteenth, and Fifteenth Amendments to the Constitution of the United States; under the Civil Rights Act of 1871, 42 U.S.C. Sec. 1983; and under the Voting Rights Act of 1965, as amended, 42 U.S.C. Sec. 1973, *et seq.*

The defendants are the Board of School Commissioners of Mobile County (Board or school commissioners), Robert R. Williams, Dan C. Alexander, Jr., Norman J. Berger, Ruth F. Drago, and Homer L. Sessions, the Mobile County Commissioners, Howard E. Yeager, Coy Smith, G. Bay Haas, and the Probate Judge, John L. Moore, the Court Clerk of Mobile County, John E. Mandeville, and the Sheriff of Mobile County, Thomas J. Purvis, and Mobile County, who are sued individually and in their official capacities.

For purposes of clarity, a separate opinion and order will be rendered in this case against the school commissioners, et al., and the Mobile County Commissioners, et al.[1]

---

**1.** Many of the facts and most of the law in the Board of School Commissioners and the County Commissioners are as applicable to one defendant as to the other. There are some facts and points of law which are different, particularly with reference to the law creating the different offices and the unresponsiveness of each. Because of this, separate opinions and orders will be rendered. A similar lawsuit against the Mobile City Commissioners, Civil Action No. 75–297–P, *Bolden et al. v. City of Mobile et al.*, D.C., 423 F.Supp. 384, was tried within weeks of this case. All three cases have been under consideration simultaneously. Many of the facts, and much of the law, in the *City* case and *County* cases are the same. Where the applicable Findings of Fact and Conclusions of Law in the two cases and with reference to the respective defendants, are substantially the same, it will be set out at length rather than referring to one or other of the three opinions and orders.

The plaintiffs contend that the at-large election system, in the historical and present context of official and social racism in Alabama and Mobile County, has for all practical purposes denied black citizens equal access to participation in the county-wide election of School Commissioners of Mobile County and has substantially diluted their vote.[2]

This court has jurisdiction over the claims grounded on 42 U.S.C. Sec. 1983 against the Board members and over the claims grounded on 42 U.S.C. Sec. 1973 against all defendants and under 28 U.S.C. Secs. 1343(3)–(4) and 2201.

This cause was certified as a class action under Rule 23(b)(2) F.R.C.P., the plaintiff class being all black persons who are now citizens of Mobile County, Alabama.

A claim originally asserted under 42 U.S.C. Sec. 1985(3) was dismissed for failure to state a claim upon which relief can be granted.

The defendants under consideration in this portion of the case are the five school commissioners, the Probate Judge, the Court Clerk of the County, the Sheriff and the Board of School Commissioners of Mobile County.

The plaintiffs seek a preliminary and permanent injunction enjoining all defendants and others acting at their direction or in concert with them, of holding, supervising, or certifying the results of any election for the Board under the present at-large election system and ordering the reapportionment of the Board into racially non-discriminatory single-member districts, together with attorneys' fees and costs. (See preliminary pretrial response filed July 30, 1976.)

Plaintiffs claim that to prevail they must prove to this court's satisfaction the existence of the elements probative of voter dilution as set forth by *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and *Zimmer v. McKeithen*, 485 F.2d

1297 (5th Cir. 1973) (en banc), aff'd, *sub nom East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976), contending *Zimmer* is only the adoption of specified criteria by the Fifth Circuit of the *White* dilution requirements.

The Board defendants stoutly contest the claim of unconstitutionality of the Board as measured by *White* and *Zimmer*. They claim the plaintiffs have no constitutional right to a politically safe black district and that the mere showing of adverse impact on the plaintiffs' political fortunes will not warrant the relief requested as measured by *White* and *Zimmer*.

They further contend that *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), erects a barrier since the legislative act forming the multi-member, at-large election of the Board members was without racial intent or purpose. They assert *Washington*, 426 U.S. 229, 96 S.Ct. at 2047–49, which was an action alleging due process and equal protection violations, held that in these constitutional actions, in order to obtain relief, proof of *intent* or *purpose* to discriminate by the defendants must be shown. Defendants state, therefore, that since the statute under which the Board members are elected was passed when essentially all blacks were disenfranchised, there could be no intent or purpose to discriminate at the time the statute or the Constitution was adopted. Alternatively, however, defendants contend that if *Washington* does not preclude consideration of the dilution factors of *White* and *Zimmer*, they should still prevail because plaintiffs have not sustained their burden of proof under these and subsequent cases.

Plaintiffs' reply is to the effect that *Washington* did not establish any new constitutional purpose principle and that *White* and *Zimmer* still are applicable. If, however, this court finds *Washington* to require

2. The plaintiffs also contended in its complaint that the present system of electing the school commissioners "discriminates against the rural interests in the county by submerging their local strength in the countywide urban majority." Plaintiffs did not pursue this aspect of the complaint either in the offering of evidence or final arguments. The court treats this ground as abandoned.

a showing of racial motivation at the time of passage of the 1919 or later statutes, plaintiffs contend they should still prevail, claiming the at-large election system was designed and is utilized with the motive or purpose of diluting the black vote. Plaintiffs claim that the discriminatory intent can be shown under the traditional tort standard.

The defendants further contend that the plaintiffs are not entitled to relief because they do not come before the court with clean hands because the plaintiffs thwarted the efforts of the Board to procure passage by the State Legislature of a constitutionally sound statute providing for single-member districts.

## FINDINGS OF FACT

Mobile County, Alabama, is located in the southwestern part of the State bordered on the south by the Gulf of Mexico, on the west by the State of Mississippi, and a large portion of the county to the east by Mobile Bay. In 1970, the county's population was 317,308 with approximately 32.5% of the residents non-white. (Defendants' Exhibit No. 6, p. 1.)

A 1976 estimate placed the county's population at 337,200 with approximately 32.5% of the population non-white. (Defendants' Exhibit No. 6, p. 1.) Practically all county non-whites are black. The 1970 population of the City of Mobile was 190,026 with approximately 35.4% of the residents black.[3]

3. The court takes judicial knowledge of its records. A companion case, *Bolden et al. v. City of Mobile*, D.C., 423 F.Supp. 384, Civil Action No. 75–297–P, under consideration by the court at the same time this case was under consideration, Defendants' Exhibit No. 12, cited these figures according to the 1970 Federal Census.

4. See *Board of School Commissioners v. Hahn*, 246 Ala. 662, 22 So.2d 91, 92, 93, for a discussion of the history and continuance of the school system in Mobile and Alabama.

5. Article XIV, Section 270 of the Constitution of 1901:
"The provisions of this article and of any act of the legislature passed in pursuance thereof to

The 1970 voter age population, 18 years of age and older, was 64.8% for whites and 55.2% for blacks. (Defendants' Exhibit No. 6, p. 18.) An estimate of the black vote as percentage of the total vote in the 1976 primary elections was 24.4% black of the total vote cast. (Defendants' Exhibit No. 6, p. 24).

Almost two-thirds of the county's population resides in the City of Mobile and a large portion of the other blacks in the county reside in the adjoining municipality of Prichard. Of the 103,238 non-whites in the county, 88,890 live in Mobile and Prichard. Only 12,718 non-whites live outside the incorporated municipalities. (Defendants' Exhibit 6, p. 5). It is obvious that the evidence relating to the City of Mobile elections, and other evidence relating to voter dilution in the City of Mobile are relevant in this case.

The Mobile County School System is unique in the State of Alabama. The first public school system in the State of Alabama was organized as the Mobile County System.[4]

The Constitution of 1901 preserved the integrity of this system.[5]

Most of the school systems in the rest of the State have both city and county school systems in the various counties.

The plaintiffs contend that the five member at-large scheme was the result of Act No. 498 passed on September 21, 1939, construed together with Title 52, Sec. 62, *et seq., Code of Alabama* (1958) (1939, etc.

establish, organize, and maintain a system of public schools throughout the state, shall apply to Mobile County only so far as to authorize and require the authorities designated by law to draw the portions of the funds to which said county shall be entitled for school purposes and to make reports to the superintendent of education as may be prescribed by law; and all special incomes and powers of taxation as now authorized by law for the benefit of public schools in said county shall remain undisturbed until otherwise provided by the legislature; provided, that separate schools for each race shall always be maintained by said school authorities."

Acts), which is derived from the 1927 school code. The defendants contend that these are legislative acts of *general* application and have no applicability to the Mobile County Public School System by virtue of the provisions of Sec. 270 of the Constitution of Alabama of 1901 as interpreted by the Alabama Supreme Court in case law. The defendants contend the present existence of the school system and of the school board is provided by a *local* legislative act passed in 1919, Local Acts 1919, p. 73. In any event, there are five commissioners who run on a place-type ballot and are elected by an at-large vote of the county. There is no requirement that each commissioner reside in a particular part of the county. The commissioners are elected on a staggered basis every two years for a six year term. The defendants Probate Judge, Circuit Clerk of Mobile County, and Sheriff, or persons appointed in their stead, by the Register in equity, serve as the appointing board for election officials (Title 17, Secs. 120–26, *Code of Alabama* (1958) and as the Board of Election supervisors to certify election results. Id. Secs. 139, 139(1), 199, 209, 344).

In *Zimmer*, aff'd, *sub nom. East Carroll Parish School Board*, (". . . but without approval of the constitutional views expressed by the Court of Appeals."), the Fifth Circuit synthesized the *White* opinion with the Supreme Court's earlier *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971) decision, together with its own opinion in *Lipscomb v. Jonsson*, 459 F.2d 335 (5th Cir. 1972) and set out certain factors to be considered.

Based on these factors as set out in *Zimmer*, 485 F.2d at 1305, the court makes the following findings with reference to each of the primary and enhancing factors:

## LACK OF OPENNESS IN THE SLATING PROCESS OR CANDIDATE SELECTION PROCESS TO BLACKS.

Mobile County blacks were subjected to massive official and private racial discrimination until the Voting Rights Act of 1965.[6] It has only been since that time that significant diminution of these discriminatory practices has been made. The overt forms of many of the rights now exercised by all Mobile County citizens were secured through national legislation, federal court orders, and a moral commitment of many dedicated white and black citizens plus the power generated by the restoration of the right to vote which substantially increased the voting power of the blacks. Public facilities are open to all persons. The pervasive effects of past discrimination still substantially affects political black participation.

There are no formal prohibitions against blacks seeking office in Mobile County.[7] Since the Voting Rights Act of 1965, blacks register and vote without hindrance. The election of the school commissioners is partisan and black and whites participate in both parties. However, the court has a duty to look deeper rather than rely on surface appearance to determine if there is true openness in the process and determine whether the processes "leading to nomination and election [are] . . . equally open to participation by the group in question . . . ." *White*, 412 U.S. at 766, 93 S.Ct. at 2339. One indication that local political processes are not equally open is the fact that no black person has ever been elected to the at-large school board. This is true although the black population level is almost one-third.

In the 1960's and 1970's, there has been general polarization in the white and black voting. The polarization has occurred with

---

**6.** In the companion case, *Bolden v. City of Mobile*, the evidence was uncontradicted that in 1946 there were only approximately 255 black registered voters out of more than 19,000 registered voters.

**7.** The qualifying fee for candidates for the city commission was found unconstitutional in *Thomas v. Mims*, 317 F.Supp. 179 (S.D.Ala. 1970). See also *U. S. v. State of Ala.*, 252 F.Supp. 95 (M.D.Ala.1966) (three judge district court panel) (poll tax declared unconstitutional).

white voting for white and black for black if a white is opposed to a black, or if the race is between two white candidates and one candidate is identified with a favorable vote in the black wards, or identified with sponsoring particularized black needs. When this occurs, a white backlash occurs which usually results in the defeat of the black candidate or the white candidate identified with the blacks.

Since 1962, four black candidates have sought election in the at-large county school board election. Dr. Goode in 1962, Dr. Russell in 1966, Ms. Jacobs in 1970, and Ms. Gill in 1974. All of these black candidates were well educated and highly respected members of the black community. They all received good support from the black voters and virtually no support from whites. They all lost to white opponents in run-off elections.

Three black candidates entered the race of the Mobile City Commission in 1973. Ollie Lee Taylor, Alfonso Smith, and Lula Albert. They received modest support from the black community and virtually no support from the white community. They were young, inexperienced, and mounted extremely limited campaigns.

Two black candidates sought election to the Alabama State Legislature in an at-large election in 1969. They were Clarence Montgomery and T. C. Bell. Both were well supported from the black community and both lost to white opponents.

Following a three-judge federal court order in 1972[8] in which single-member districts were established and the house and senate seats reapportioned, one senatorial district in Mobile County had an almost equal division between the black and white population. A black and white were in the run-off. The white won by 300 votes. There were no overt acts of racism. Both candidates testified and asserted each appealed to both races. It is interesting to note that the white winner published a simulated newspaper with both candidate's

photographs appearing on the front page, one under the other, one white, one black.

One city commissioner, Joseph N. Langan, who served from 1953 to 1969, had been elected and reelected with black support until the 1965 Voting Rights Act enfranchised large numbers of blacks. His reelection campaign in 1969 foundered mainly because of the fact of the backlash from the black support and his identification with attempting to meet the particularized needs of the black people of the city. He was again defeated in an at-large county commission race in 1972. Again the backlash because of the black support substantially contributed to his defeat.

In 1969, a black got in a run-off against a white in an at-large legislature race. There was an agreement between various white prospective candidates not to run or place an opponent against the white in the run-off so as not to splinter the white vote. The white won and the black lost.

Practically all active candidates for public office testified it is highly unlikely that anytime in the foreseeable future, under the at-large system, that a black can be elected against a white. Most of them agreed that racial polarization was the basic reason. The plaintiffs introduced statistical analyses known as "regression analysis" which supported this view. Regression analysis is a professionally accepted method of analyzing data to determine the extent of correlation between dependent and independent variables. In plaintiffs' analyses, the dependent variable was the vote received by the candidates studied. Race and income were the independent variables whose influence on the vote received was measured by the regression. There is little doubt that race has a strong correlation with the vote received by a candidate. These analyses covered every city commission race in 1965, 1969, and 1973, both primary and general election of county commission in 1968 and 1972, and selected school board races in 1962, 1966, 1970, 1972, and 1974. They also covered referendums held to change the form of city government

8. *Sims v. Amos*, 336 F.Supp. 924 (M.D.Ala. 1972).

in 1963 and 1973 and a countywide legislative race in 1969. The votes for and against white candidates such as Joe Langan in an at-large city commission race, and Gerre Koffler, at-large county school board commission, who were openly associated with black community interests, showed some of the highest racial polarization of any elections.

Since the 1972 creation of single-member districts, three blacks of the present fourteen member Mobile County delegation have been elected. Their districts are more heavily populated with blacks than whites.

Prichard, an adjoining municipality to Mobile, which in recent years has obtained a black majority population, elected the first black mayor and first black councilman in 1972.

Black candidates at this time can only have a reasonable chance of being elected where they have a majority or a near majority. There is no reasonable expectation that a black candidate could be elected in a citywide election race because of race polarization. The court concludes that an at-large system is an effective barrier to blacks seeking public life. This fact is shown by the removal of such a barrier, i. e., the disestablishment of the multi-member at-large elections for the state legislature. New single member districts were created with racial compositions that offer blacks a chance of being elected, and they are being elected.

The court finds that the structure of the at-large election of school commissioners combined with strong racial polarization of the county's electorate continues to effectively discourage qualified black citizens from seeking office or being elected thereby denying blacks equal access to the slating or candidate selection process.

## UNRESPONSIVENESS OF THE ELECTED SCHOOL COMMISSIONERS OF MOBILE COUNTY TO THE BLACK MINORITY.

The at-large elected county board members have not been responsive to the minorities' needs, who constitute 32.5% of the total population.

The Mobile County School System maintained a dual school system which prolonged segregation until sometime after *Davis v. Board of School Commissioners of Mobile County*, Civil Action No. 3003-63-H, was commenced in this court in 1963. The lengthy record in *Davis, supra*, is devastating evidence of the complete unresponsiveness and resistance on the part of the Board to the particularized needs and aspirations of the black community.

This record (the docket sheet itself comprises some 27 pages. See Plaintiffs' Exhibit No. 99.) is replete with dilatory actions by the Board attempting to forestall the implementation of a desegregated school system. Another judge of this court was put in a position of having to compel the school Board to desegregate the school system against the Board's adamant refusal to respond voluntarily to black community interests and the prevailing law of the land. The record shows that on numerous occasions the court, faced with the complete failure of the Board to cooperate, had the unpleasant task of forcing the Board to carry out its lawful directives.

The Board usually acted only in response to numerous restraining and injunctive orders by the court. This occurred over a period of time covering more than a decade of litigation. The restraining orders were all of the same import, to wit, that the School Board follow the law as required by the Constitution.

"The defendant, Board of School Commissioners of Mobile County and the other individual defendants . . ., be and they are hereby restrained and *enjoined from requiring and permitting segregation of the races* in any school under their supervision from and after such time as may be necessary to make arrangements for admission of children to such school on a racially non-discriminatory basis with all deliberate speed, as required by the Supreme Court in *Brown v. Board of Education of Topeka*, 1954,

349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083." (Emphasis added.) [9]

"It is ORDERED, ADJUDGED and DE-CREED that the *defendants,* their agents, officers, employees and successors and all those in active concert and participation with them, be and they are permanently *enjoined from discriminating* on the basis of race or color in the operation of the school system. \* \* \* [T]hey *shall take affirmative action to disestablish* all school segregation and to eliminate the effects of the dual school system." (Emphasis added.) [10]

The utter frustration of the court over the repeated failure of the School Board to make a good faith effort to carry out its duties as to all of the students in the system was well articulated in an order of August 1, 1969 (M.E. No. 25,826), wherein the court stated:

"With *eight years of litigation* entailing countless days and weeks of hearings in court, it has been clearly established that the Mobile County School *System must* forthwith *be operated in accordance with the law* of the land. What this school system needs is to educate children legally, and not engage in protracted litigation. After all, the children are the ones in whom we should be most interested." (Emphasis added.)

On March 16, 1970, this same judge, faced with the failure of the Board to carry out certain orders of this court entered pursuant to directives of the Fifth Circuit follow-ing rulings of the Supreme Court of the United States, entered an order which stated in pertinent part:

"The School Board is required to follow the *order* of this court of January 31, 1970, as amended and if the same is *not followed* within three days from this date, a *fine of $1,000 per day* is hereby assessed for each such day, against each member of the Board of School Commissioners." [11] (Emphasis added.)

The Fifth Circuit has, in its numerous orders and opinions,[12] noted with displeasure, the total lack of cooperation exhibited by the Board. In *Davis II* (see n. 12, supra), it was stated:

"Although it seems to be acknowledged on all hands that a *racially segregated system* is still *maintained,* the Defendants' legal position \* \* \* is that the Plaintiffs have not set forth a claim entitling them to relief. So far as this record shows, the *Defendant* school authorities have *not* to this day ever *acknowledged* that (a) the present system is constitutionally invalid or (b) that there is any obligation on their part to make any changes at any time." 322 F.2d at p. 358. (Emphasis added.)

In *Davis IV* (see n. 12, *supra* ), the court said:

" . . . [I]t must also be borne in mind that this school *board ignored for nine years* the requirement clearly stated in *Brown* that the School authorities have the primary responsibility for solving this

**9.** Order of July 11, 1963, M.E. No. 15,289.

**10.** Order of April 7, 1969, M.E. No. 25,342. See also:
1. M.E. No. 15,555, dated 9/9/63
2. M.E. No. 25,274, dated 3/27/69
3. M.E. No. 26,553, dated 1/28/70
4. M.E. No. 27,705, dated 9/14/70

**11.** M.E. No. 26,771, dated 3/16/70.

**12.** I. *Davis v. Bd. of School Comm. of Mobile County,* 318 F.2d 63 (1963)
    II. *Davis,* 322 F.2d 356 (1963), cert. den. 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123; reh. den. 376 U.S. 928, 84 S.Ct. 656, 11 L.Ed.2d 628.
    III. *Davis,* 333 F.2d 53 (1964), cert. den. 379 U.S. 844, 85 S.Ct. 85, 13 L.Ed.2d 49.

    IV. *Davis,* 364 F.2d 896 (1966)
    V. *Davis,* 393 F.2d 690 (1968)
    VI. *Davis,* 414 F.2d 609 (1969)
    VII. *Singleton v. Jackson Municipal Separate School Dist.,* 419 F.2d 1211 (1969)
    VIII. *Davis,* 422 F.2d 1139 (1970)
    IX. *Davis,* 430 F.2d 883 (1970); on remand 430 F.2d 889; aff. in part, rev. in part, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577
    X. *Davis,* 483 F.2d 1017 (1973)
    XI. *National Education Ass'n v. Board of School Comm. of Mobile County,* 483 F.2d 1022 (1973)
    XII. *Davis,* 496 F.2d 1181 (1974)
    XIII. *Davis,* 517 F.2d 1044 (1975)
    XIV. *Davis,* 526 F.2d 865 (1976)

constitutional problem." 364 F.2d at 898, n. 1. (Emphasis added.)

In *Davis V* (see n. 12, *supra*), the Fifth Circuit stated, through Judge Thornberry: "In the last Mobile case, Judge Tuttle said *there must 'be an end to* the present policy of hiring and assigning teachers according to race by the time the last of the schools are fully desegregated for the school year 1967—68.' 364 F.2d at 904. . . . [D]espite the Court's decree, it seems apparent that the policy of hiring and *assigning teachers according to race* still exists. * * * The reason for the lack of progress is that the board has not yet shouldered the burden." 393 F.2d at 695. (Emphasis added.)

Further evidence is contained in *Davis IX* (see n. 12, *supra*), where, on page 886, it is stated:

"The Mobile County school *system has* almost *totally failed to comply* with the faculty ratio requirement although ordered to do so by the district court on August 1, 1969." (Emphasis added.)

Further, it was pointed out in note 4 thereof, in discussing desegregation plans: ". . . but the *defendants*, the only parties in possession of current and accurate information, have *offered no help*. This lack of cooperation and generally *unsatisfactory* condition, created by defendants, should be terminated at once by the district court." 430 F.2d at p. 888. (Emphasis added.)

There are, to date, many unresolved controversies remaining in *Davis*. There is no doubt that with a more cooperative School Board making a more responsive effort to conform to the law, the process of implementing a constitutionally acceptable unitary school system would have been accomplished faster and without the divisiveness, and lengthy and expensive litigation already experienced.

Today, thirteen years after the filing of the *Davis* case, the Board is operating under "A Comprehensive Plan for a Unitary School System" order of this court issued pursuant to a mandate of the Supreme Court of the United States and of the Fifth Circuit Court of Appeals. Under these circumstances, the defendants can justly claim little credit for this alleged responsiveness today to black needs.

## THERE IS NO TENUOUS STATE POLICY SHOWING A PREFERENCE FOR AT–LARGE DISTRICTS.

There is no clear cut *State* policy either for or against multi-member districting or at-large elections in the State of Alabama, considered as a whole. The lack of State policy therefore must be considered as a neutral factor.

In considering the State policy with specific reference to Mobile, the Mobile County School System was established in 1826, the first provision for a "public" school system in the State.[13] The commissioners were to be elected at-large. In 1854, the first general public school system for the State of Alabama was enacted.[14] Section 2 of Article VI of that Act recognized and maintained the Mobile County School System separate and apart from the school system for the State. This was incorporated in the Constitution of 1875 and the Constitution of 1901, Sec. 270 of Article XIV. The at-large election of the Mobile County School Commissioners has continued to the present time. The manifest policy of Mobile County has been to have at-large or multi-member districting.

### PAST RACIAL DISCRIMINATION.

Prior to the Voting Rights Act of 1965, there was effective discrimination which precluded effective participation of blacks in the elective system in the State, including Mobile County.

One of the primary purposes of the 1901 Constitutional Convention of the State of Alabama was to disenfranchise the blacks. The Convention was singularly successful in

**13.** Acts of Alabama, 1825–26, p. 35. This Act provided for not less than thirteen nor more than twenty-five commissioners.

**14.** Acts of Alabama, 1853–54, p. 8.

this objective. The history of discrimination against blacks' participation, such as the cumulative poll tax, the restrictions and impediments to blacks registering to vote, is well established.

Local discrimination in the city and the county has been established in connection with the lawsuits concerning racial discrimination arising in this court, to wit, *Allen v. City of Mobile*, 331 F.Supp. 1134 (S.D.Ala. 1971), aff'd 466 F.2d 122 (5th Cir. 1972), cert. den. 412 U.S. 909, 93 S.Ct. 2292, 36 L.Ed.2d 975 (1973); *Anderson v. Mobile County Commission*, Civil Action No. 7388–72–H (S.D.Ala.1973); *Sawyer v. City of Mobile*, 208 F.Supp. 548 (S.D.Ala.1961); *Evans v. Mobile City Lines, Inc.*, Civil Action No. 2193–63 (S.D.Ala.1963); and *Cooke v. City of Mobile*, Civil Action No. 2634–63 (S.D. Ala.1963). *Preston v. Mandeville*, 479 F.2d 127 (5th Cir. 1973), was a countywide case involving racial discrimination of Mobile's jury selection practices. *Smith v. Allwright*, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944) (white primaries) was applicable to Alabama and some Alabama cases of discrimination are *Davis v. Schnell*, 81 F.Supp. 872 (S.D.Ala.1949), aff'd 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093 (1949), ("interpretation" tests for voter registration), *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960) (racial gerrymandering of local government), *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (racial gerrymandering of state government), and *U. S. v. Alabama*, 252 F.Supp. 95 (M.D.Ala.1966) (Alabama poll tax).

The racial polarization existing in the city and county elections has been discussed herein. The court finds that the existence of past discrimination has helped preclude the effective participation of blacks in the election system today in the at-large system of electing school commissioners.

In the 1950's and early sixties, prior to the Voting Rights Act of 1965, only a relatively small percentage of blacks were registered to vote in the county.[15] Since the Voting Rights Act, the blacks have been able to register to vote and become candidates.

## ENHANCING FACTORS.

With reference to the enhancing factors, the court finds as follows:

(1) The countywide election encompasses a large district. Mobile County has an area of 1,240 square miles with a population of 317,308 in 1970 and an estimated population of 337,200 in 1976.

(2) There is a majority vote requirement for the school commissioners in the primaries.

(3) There is no anti-single shot voting provision but the candidates run for positions by place or number.[16]

(4) There is a lack of provision for the at-large candidates to run from a particular geographical sub-district, as well as a lack of residence requirement.

The court concludes that in the aggregate, the at-large election structure as it operates in the countywide election of the school commissioners of Mobile County substantially dilutes the black vote in these elections.

## CONCLUSIONS OF LAW.

### I.

██ The court addresses itself first to the contention of the defendants that the plaintiffs are not entitled to relief because

---

**15.** In the 1950's and 1960's, the impediments placed in the registration of the blacks to vote were not as aggravated in Mobile County as in some counties. It was not necessary for voter registrars to be sent to Mobile to enable blacks to register. However, as previously noted, in 1946 only 255 blacks out of over 19,000 voters were registered.

**16.** The influence of this enhancing factor is minimal. It is this writer's opinion, born out of 15 years experience in a State judicial office subject to the electoral process, that the public's best interest is served, and it can make more intelligent choices, when candidates run for numbered positions. The choices between candidates are narrowed for the voter and they can be compared head to head.

they do not come before the court with clean hands because they thwarted the efforts of the school commissioners to procure passage by the State Legislature of a *constitutionally* sound statute pending in the 1976 legislature providing for reapportionment of the Board into five single-member districts. These defendants further contend that the Legislature has demonstrated a willingness to pass a constitutionally sound statute providing for reapportionment of the school board into five single-member districts and that this function should be left to the Legislature.

The complaint in this cause was filed in June of 1975. The State Legislature in the summer months of 1975 passed a *local* act reapportioning the Board membership into five single-member districts which these defendants claim they supported. The Board members were dismissed as parties defendant. Shortly thereafter, these defendants sought a declaratory judgment in the State court as to whether or not the local act was constitutional. The State court declared the act was fatally defective because of the manner in which the act was published.[17]

On March 8, 1976, the plaintiffs sought and received leave to add the Board members as parties defendant by an amended complaint. These defendants were served March 19, 1976. They failed to plead. On July 12, the plaintiffs filed a motion for a default judgment. On that date, the Board members filed an answer and responded to the motion for default judgment. The case was set for trial July 19, 1976. It was continued at the request of these defendants.[18] The case was reset for trial September 9, 1976. On September 2, 1976, these defendants filed a motion to sever and to dismiss or continue.[19] On September 9, 1976, these defendants filed a motion to stay pending certification for interlocutory appeal and a motion to stay pending appeal, all of which were denied. Beginning with these defendants' response to motion for default judgment and in connection with other motions herein mentioned, these Board members have contended they were making a good faith effort to get a *constitutionally sound legislative* enactment passed in the 1976 Legislature but the plaintiffs blocked passage of the bill. They sought a continuance until the legislature meets again in 1977 to give that legislature an opportunity to pass a constitutionally sound bill dividing the school board into five single-member districts. Although the language varied in motion to motion and document to document, the thrust of each motion was that single-member districts could be provided for by the legislature. The September 2 motion to sever and dismiss and continue by these defendants used this language:

> "Despite the efforts of these defendants, the bill was not passed into law but was blocked by the negative votes of three members of the Mobile County legislative delegation.",

all of whom were black and within the plaintiff class. On the last page of the motion, this language was used:

> "And the Board of School Commissioners of Mobile County can be reapportioned into five single member districts meeting all *constitutional* standards by the *normal*

17. Article IV, Sec. 106 of the Constitution of 1901:

"Sec. 106. No special, private, or local law shall be passed on any subject not enumerated in section 104 of this Constitution, except in reference to fixing the time of holding courts, unless notice of the intention to apply therefor shall have been published, without cost to the state, in the county or counties where the matter or thing to be affected may be situated, which notice shall state the substance of the proposed law and be published at least once a week for four consecutive weeks in some newspaper published in such county or counties, or

if there is no newspaper published therein, then by posting the said notice for four consecutive weeks at five different places in the county or counties prior to the introduction of the bill; and proof by affidavit that said notice has been given shall be exhibited to each house of the legislature, and said proof spread upon the journal. The courts shall pronounce void every special, private, or local law which the journals do not affirmatively show was passed in accordance with the provisions of this section."

18. See "Appendix A."

19. See n. 18, *supra*, "Appendix A."

*legislative* process. . . ." (Emphasis added.)

The same, or substantially the same language was used in the September 9 motion for a stay pending appeal. In a proposed Findings of Fact and Conclusions of Law prepared by these defendants in pursuance of this court's pretrial order, on the last two pages this language was used:

"The Legislature of the State of Alabama has demonstrated its willingness, without intervention by this court, to provide a constitutionally sound system of governance for the Mobile County Public School System.. . . ."

and

". . . plaintiffs have on at least one occasion blocked the good faith efforts to the defendant School Board to procure passage by the State Legislature of a *constitutionally* sound *statute* providing for reapportionment of the School Board into five single-member districts." (Emphasis added.)

In a trial memorandum of these defendants, page 26, it was stated:

". . . it is entirely clear that the legislative remedy is available."

This brief was filed September 2.

The evidence before the court indicated that the black legislators from this county became concerned with whether or not the proposed act pending in the 1976 legislature would be constitutionally sound. During closing arguments in this cause, the provisions of the 1901 Constitution, Sec. 270 [20] were discussed. The court directed an inquiry to counsel for these defendants whether or not it was his contention and belief that the at-large system could be constitutionally changed by the bill pending in the 1976 legislature. He answered no because the bill was a *general* bill, citing Alabama Supreme Court authorities, which he contended supported his position. This was the first notice the court had that the legal position of counsel for these defendants was that the single-member district bill as drafted and presented to the 1976

legislature could not be constitutionally enacted. In the post-trial memorandum filed by these defendants September 29, 1976, p. 4, it was stated:

". . . and *general* Acts of the Legislature relating to school matters have no applicability to the Mobile County Public School system by virtue of the provisions of § 270 of the Constitution of Alabama of 1901." (Emphasis added.)

These defendants had persistently contended the 1976 bill was the same as the 1975 Act. It was not. According to these defendants now, there is a vital difference. The 1975 Act was a *local* act, the proposed 1976 Act was a *general* act. These developments explode these defendants' contention that the plaintiffs do not come into court with clean hands. Clearly, these defendants were trying to place the shoe on the wrong foot. The court takes judicial notice of the lack of cooperation and dilatory practices of the School Board in the past in the *Birdie Mae Davis* case.

## II.

There is a threshold question faced by this court in whether or not *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), is dispositive of this case so as to preclude an application of the factors determinative of voter dilution as set forth in *White* and *Zimmer*, aff'd. *sub nom. East Carroll Parish School Board.*

It is the defendants' contention that *Washington* makes it clear that to prevail the plaintiffs must prove that the statute establishing the at-large election was adopted with a discriminatory *purpose.* They assert that the present existence of the five member Board and their at-large election on a staggered basis every two years is provided for by a *local* Act enacted in 1919, and at that time the blacks were disenfranchised. If the court accepted the plaintiffs' contention that the 1939, etc. Acts, *general* acts, are the statutes the Board is operating under, it would make no difference because the blacks were effectively disenfranchised at the time of those enactments. There-

**20.** See n. 5, *supra.*

fore, this court need not determine the Alabama constitutional question, to wit, does it take a *local* act or a constitutional amendment to change the present make-up of the Board and the manner by which they are elected. It is reasoned in either event that the at-large system of electing school commissioners when adopted had no relation to minimizing or diluting the black vote because there was none.

The plaintiffs contend that *Washington did not establish a new Supreme Court purpose* test.

The thrust of the defendants' argument is that if the 1919 statute (or by implication, the 1939, etc. Acts) creating the present Board and their election at-large was neutral on its face *Washington does not* permit this court to consider other evidence or factors and must decide for the school commissioners. It is argued that *Washington* is a benchmark decision requiring this finding in the multi-member at-large school commissioners' election.

The school commissioners contend the board membership and at-large election was provided for by either of these statutes enacted during a period of time when the blacks were substantially disenfranchised in the State of Alabama. One of the primary purposes of the 1901 Constitutional Convention was to disenfranchise the blacks.[21]

The court, therefore, will proceed to examine *Washington* on the proposition that the present school board membership and at-large election was provided for by either the 1919 or 1939, etc. Acts of the Legislatures.

*Washington* upheld the validity of a written personnel test administered to prospective recruits by the District of Columbia Police Department. It had been alleged the test "excluded a disportionately high number of Negro applicants." *Id.* 426 U.S. at

233, 96 S.Ct. at 2044. The petitioners claimed the effect of this disportionate exclusion violated their Fifth Amendment due process rights and 42 U.S.C. § 1981. *Id.* 426 U.S. 229, 96 S.Ct. at 2044. Evidence indicated that four times as many blacks failed to pass the test as whites. Plaintiffs contended the impact in and of itself was sufficient to justify relief. They made no claim of an intent to discriminate. The District Court found no intentional conduct and refused relief. The Circuit Court reversed, relying upon *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). *Griggs* was a Title VII action (42 U.S.C. § 2000e, *et seq.*) in which the racially discriminatory impact of employment tests resulted in their invalidation by the court.

The Supreme Court in *Washington* reconciled its decision with several previous holdings, distinguished some, and expressly overruled some cases in which there were possible conclusions different from *Washington.*

They made *no reference to the recent pre-Washington* cases of its or appellate courts' voting dilution decisions dealing with at-large or multi-member versus single-member districts, and, in particular, no mention was made of the cardinal case in this area, *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), nor to *Dallas v. Reese,* 421 U.S. 477, 95 S.Ct. 1706, 44 L.Ed.2d 312 (1975), and *Chapman v. Meier,* 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975), nor to *Zimmer,* which the Court had affirmed only a few months before, nor to *Turner v. McKeithen,* 490 F.2d 191 (5th Cir. 1975). No reference was made to *Fortson v. Dorsey,* 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965), to *Reynolds,* nor to *Whitcomb. Whitcomb,* 403 U.S. at 143, 91 S.Ct. 1858, recognized that in an at-large election scheme, a showing that if in a particular case the system operates to mini-

---

**21.** The history of Alabama indicates that there was a populist movement at that time which sought to align the blacks and the poor whites. The Bourbon interest of the State sought to disenfranchise the poor whites, along with the blacks, but were unsuccessful, excepting the cumulative feature of the poll tax. They were

singularly successful disenfranchising the blacks. The 1901 Constitution had this provision about the Mobile school system: ". . . provided, that separate schools for each race shall always be maintained by said school authorities." N. 5, *supra.*

mize or cancel out the voting strength of racial or political elements, the courts can alter the structure. Had the Supreme Court intended the *Washington* case to have the far reaching consequences contended by defendants, it seems to this court reasonable to conclude that they would have made such an expression.

There are several reasons which may be plausibly advanced as to why the *Washington* Court did not expressly overrule nor discuss these cases. Courts are not prone to attempt to decide every eventuality of a case being decided or its effect on all previous cases. The Court may have desired that there be further development of the case law in the district and circuit courts before commenting on the application of *Washington* to this line of cases. The cases may be distinguishable and reconcilable with the expressions in *Washington*. Or, it may not have been the intention of the *Washington* Court to include these cases within the ambit of its ruling.

*Washington* spoke with approval of *Wright v. Rockefeller*, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512 (1964), reh. den. 376 U.S. 959, 84 S.Ct. 964, 11 L.Ed.2d 977, setting out the "intent to gerrymander" requirement established in *Wright. Washington*, 426 U.S. 229, 96 S.Ct. at 2047–48.

*Wright* was the direct descendant of *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). These two cases involved racial gerrymandering of political lines. *Gomillion* dealt with an attempt by the Alabama legislature to exclude most black voters from the municipal limits of Tuskegee so whites could control the election. The court found that the State of Alabama impaired the voting rights of black citizens while cloaking it in the garb of the realignment of political subdivisions and held there was a violation

of the Fifteenth Amendment. *Gomillion*, at 345, 81 S.Ct. 125. There was no direct proof of racial discriminatory intent. Justice Stevens in his concurring opinion noted with approval, ". . . when the disproportion[ate impact] is as dramatic as in *Gomillion* . . ., it really does not matter whether the standard is phrased in terms of *purpose or effect.*" *Washington*, 426 U.S. at 254, 96 S.Ct. at 2054.[22] (Emphasis added.)

*Wright* dealt with the issue of congressional redistricting of Manhattan. The plaintiffs alleged racially motivated districting. The congressional lines drawn created four districts. One had a large majority of blacks and Puerto Ricans. The other three had large white majorities. The court held the districts were not unconstitutionally gerrymandered upon the finding that ". . . the New York legislature was [not] motivated by racial considerations or in fact drew the districts on racial lines." *Wright*, 376 U.S. at 56, 84 S.Ct. at 605. This set forth the principle that in gerrymandering cases in order for the plaintiffs to obtain relief they must show racial motivation in the drawing of the district lines.

*Washington* then quoted with approval from *Keyes v. School District No. I*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), indicating a distinction or reconciliation of that case with *Washington*. There had not been racial purpose or motivation *ab initio* in *Keyes*. *Keyes* was a Denver, Colorado, school desegregation case. Denver schools had never been segregated by force of state statute or city ordinance. Nevertheless, the majority found that the *actions* of the School Board during the 1960's were sufficiently indicative of ". . . [a] purpose or intent to segregate" and a finding of *de jure* segregation was sus-

---

**22.** In *Paige v. Gray*, 538 F.2d 1108 (5th Cir. 1976), black citizens of Albany, Georgia, brought an action to invalidate the at-large system of electing city commissioners. At 1110, n. 3, the court noted the above quote by Justice Stevens, but in the body of the opinion expressed concern with unlawful motive for discriminatory purpose as required by *Wash-*

*ington.* However, at 1110, the court stated "the validity of Albany's change from a ward to an at-large system can best be handled by applying the multifactor test enunciated in . . . *White v. Regester* . . . and *Zimmer v. McKeithen.*" *Paige*, at 1111, stated *Zimmer* still "sets the basic standard in this circuit."

tained. *Keyes*, at 205, 208, 93 S.Ct. 2686. That court held that to find overt racial considerations in the *actions* of government officials is indeed a difficult task.[23]

*Washington* further commented:

". . . an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Washington*, 426 U.S. at 242, 96 S.Ct. at 2049.

The plaintiffs contend that *Washington's* discussion with approval of the *Keyes* case permits the application of the "tort" standard in proving intent. In his concurring opinion, Justice Stevens discussed this point:

"Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For *normally the actor is presumed to have intended the natural consequences of his deeds.* This is particularly true in the case of governmental action which is frequently the product of compromise, of collective decisionmaking, and of mixed motivation." *Washington*, at 253, 96 S.Ct. at 2054. (Emphasis added.)

The plaintiffs contend this circuit's use of the tort standard of proving intent squares with the above statements. This circuit for several years has accepted and approved the tort standard as proof of segregatory intent as a part of state action in school desegregation findings. *Morales v. Shannon*, 516 F.2d 411, 412–13 (5th Cir. 1975), *cert. den.* 423 U.S. 1034, 96 S.Ct. 566, 46 L.Ed.2d 408 (1975).

Recently, citing *Morales, supra, Cisneros v. Corpus Christi Independent School District*, 467 F.2d 142 (5th Cir. 1972) (en banc), *cert. den.* 413 U.S. 920, 93 S.Ct. 3053, 37 L.Ed.2d 1041 (1973), reh. den. 413 U.S. 922, 93 S.Ct. 3052, 37 L.Ed.2d 1044 (1973), and *United States v. Texas Education Agency*, 467 F.2d 848 (5th Cir. 1972) (en banc) (Austin I), the Fifth Circuit in *U. S. v. Texas Education Agency*, (Austin Independent School District) 532 F.2d 380 (5th Cir. 1976) (Austin II) squarely addressed the meaning of discriminatory intent in the following language:

"Whatever may have been the originally intended meaning of the test we applied in *Cisneros* and *Austin I [U. S. v. Texas Education Agency, supra,]* we agree with the intervenors that, after *Keyes*, our two opinions must be viewed as incorporating in school segregation law the ordinary rule of tort law that a person intends the natural and foreseeable consequences of his actions.

\*    \*    \*    \*    \*    \*

"Apart from the need to conform *Cisneros* and *Austin I* to the supervening *Keyes* case, there are other reasons for attributing responsibility to a state official who should reasonably foresee the segregative effects of his actions. First, it is difficult—and often futile—to obtain direct evidence of the official's intentions. . . . Hence, courts usually rely on circumstantial evidence to ascertain the decisionmakers' motivation." *Id.* at 388.

This court in its findings of fact has held that when the 1919 statute and the 1939, etc. Acts were enacted, the blacks were disenfranchised and here concludes the statutes on their respective faces were neutral. This is in line with Fifth Circuit opinions, *McGill v. Gadsden Co. Commission*, 535 F.2d 277 (5th Cir. 1976); *Wallace v. House*, 515 F.2d 619, at 633 (5th Cir. 1975), vacated 425 U.S. 947, 96 S.Ct. 1721, 48 L.Ed.2d 191 (1976). 538 F.2d 1138 (5th Cir., 1976), affirmed the District Court, 377 F.Supp. 1192, and *Taylor v. McKeithen*, 499 F.2d 893, 896 (5th Cir. 1974). However, in the larger context, the evidence is clear that one of

---

23. In another Fifth Circuit case it was held that if an official is motivated by such wrongful intent, he or she

". . . will pursue his discriminatory practices in ways that are devious, by methods subtle and illusive—for we deal with an area in which 'subtleties of conduct . . . play no small part' ". *U. S. v. Texas Ed. Agency*, 532 F.2d 380, 388, (5th Cir. 1976) (Austin II) (school desegregation).

the primary purposes of the 1901 constitutional convention was to disenfranchise the blacks.

Therefore, the legislature in 1919 and 1939, etc. Acts was acting in a race-proof situation. There can be little doubt as to what the legislature would have done to prevent the blacks from effectively participating in the political process had not the effects of the 1901 constitution prevailed. The 1901 constitution and the subsequent statutory schemes and practices throughout Alabama, until the Voting Rights Act of 1965, effectively disenfranchised most blacks.

A legislature in 1919, little more than 50 years after a bitter and bloody civil war which resulted in the emancipation of the black slaves, or a legislature in 1939, etc., should have reasonably expected that the blacks would not stay disenfranchised. It is reasonable to hold that the present dilution of black Mobilians is a natural and foreseeable consequence of the at-large election system imposed.

Under Alabama law, the legislature is responsible for passing acts modifying the form of city and county governments. Mobile County elects or has an effective electoral voice in the election of eleven members of the House and three senators. The state legislature observes a courtesy rule, that is, if the county delegation unanimously endorses local legislation, the legislature perfunctorily approves all local county legislation. The Mobile County Senate delegation of three members operates under a courtesy rule that any one member can veto any local legislation. If the Senate delegation unanimously approves the legislation, it will be perfunctorily passed in the State Senate. The county House delegation does not operate on an unanimous rule as in the Senate, but on a majority vote principle, that is, if the majority of the House delegation favors local legislation, it will be placed on the House calendar but will be subject to debate. However, the proposed county legislation will be perfunctorily approved if the Mobile County House delegation unani-

mously approves it. The evidence is clear that whenever a redistricting bill of any type is proposed by a county delegation member, a major concern has centered around how many, if any, blacks would be elected. These factors prevented any effective redistricting which would result in any benefit to the black voters passing until the State was redistricted by a federal court order.[24] There are now three blacks on the eleven member House legislative delegation. This resulted in passage in the 1975 legislature of a bill doing away with the at-large election of the County Board of School Commissioners and creating five single-member districts. This was promptly attacked by the all-white at-large elected County School Board Commission in the State court. The act was declared unconstitutional.

This natural and foreseeable consequence of the 1919 Act, or the 1939, etc. Acts, black voter dilution, was brought to fruition in a few years, the middle 1960's, and continues to the present. This court sees no reason to distinguish a school desegregation case from a voter discrimination case. It appears to this court that the evidence supports the tort standard as advocated by the plaintiffs. However, this court prefers not to base its decision on this theory. This court deems it desirable to determine if the far-reaching consequences of *Washington* as advanced by the defendants is correct without regard to *Keyes*. This court is unable to accept such a broad holding with such far-reaching consequences.

The case *sub judice* can be reconciled with *Washington*. The *Washington* Court, in Justice White's majority opinion, included the following:

"This is not to say that the necessary discriminatory racial purpose must be express or appear on the face of the statute, or that a law's disportionate impact is irrelevant in cases involving Constitution-based claims of racial discrimination. A statute, otherwise neutral on its face, must not be applied so as to invidiously discriminate on the basis of race. *Yick*

24. *Sims v. Amos*, 336 F.Supp. 924 (M.D.Ala. 1972).

*Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)." *Washington*, 426 U.S. at 241, 96 S.Ct. at 2048.

To hold that the 1919, or 1939, etc. Acts while facially neutral would defeat rectifying the invidious discrimination on the basis of race which the evidence has shown in this case would fly in the face of this principle.

It is not a long step from the *systematic exclusion of blacks* from juries which is itself such an "unequal application of the law . . . as to show intentional discrimination." *Akins v. Texas*, 325 U.S. 398, 404, 65 S.Ct. 1276, 1279, 89 L.Ed. 1692 (1945) and the deliberate systematic denials to people from juries because of their race, *Carter v. Jury Commission*, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549; *Cassell v. Texas*, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839; *Patton v. Mississippi*, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76, cited in *Washington*, 426 U.S. 229, 96 S.Ct. at 2047, to a present purpose to dilute the black vote as evidenced in this case. There is a "current" condition of dilution of the black vote resulting from intentional state legislative *inaction* which is as effective as the intentional state action referred to in *Keyes*. *Washington*, 426 U.S. 229, 96 S.Ct. at 2048.

More basic and fundamental than any of the above approaches is the factual context of *Washington* and this case. Initial discriminatory purpose in employment and in redistricting is entirely different from resulting voter dilution because of racial discrimination. *Washington's* failure to expressly overrule or comment on *White, Dallas, Chapman, Zimmer, Turner, Fortson, Reynolds*, or *Whitcomb*, leads this court to the conclusion that *Washington* did not overrule those cases nor did it establish a new Supreme Court *purpose* test and require initial discriminatory purpose where voter dilution occurs because of racial discrimination.

### III.

In order for this court to grant relief as prayed for by plaintiffs, it must be shown that the political process was not open equally to the plaintiffs as a result of dilution of voting strength and consequently the members of the class had less opportunity to participate in the political process and elect representatives of their choice. *Chapman*, 420 U.S. at 18, 95 S.Ct. 751, and *Whitcomb*. "Access to the political process and not [the size of the minority] population" is the key determinant in ascertaining whether there has been invidious discrimination so as to afford relief. *White*, 412 U.S. at 766, 93 S.Ct. 2332; *Zimmer*, 485 F.2d at 1303.

The idea of a democratic society has since the establishment of this country been only a supposition to many citizens. The Supreme Court vocalized this realization in *Reynolds* where it formulated the "one person-one vote" goal for political elections. The precepts set forth in *Reynolds* are the substructure for the present voter dilution cases, stating that "every citizen has an inalienable right to full and effective participation in the political processes . . ." *Reynolds*, 377 U.S. at 565, 84 S.Ct. at 1383. The Judiciary in subsequent cases has recognized that this principle is violated when a particular identifiable racial group is *not* able to fully and effectively participate in the political process because of the system's structure.

Denial of full voting rights range from outright refusal to allow registration, *Smith*, to racial gerrymandering so as to exclude persons from voting in a particular jurisdiction, *Gomillion*, to establishing or maintaining a political system that grants citizens all procedural rights while neutralizing their political strength, *White*. The last arrangement is maintained by the countywide at-large election of school commissioners.

Essentially, dilution cases revolve around the "quality" of representation. *Whitcomb*, 403 U.S. at 142, 91 S.Ct. 1858. The touchstone for a showing of unconstitutional racial voter dilution is the test enunciated by the Supreme Court in *White*, 412 U.S. at 765, 93 S.Ct. at 2339: "[Whether] multimember districts are being used invidiously to cancel out or minimize the voting

strength of racial groups." In *White*, for slightly different reasons in each county, the Supreme Court found that the multi-member districts in Dallas and Bexar Counties, Texas, were minimizing black and Mexican-American voting strength.

█ Attentive consideration of the evidence presented at the trial leads this court to conclude that the present at-large countywide election of school commissioners impermissibly violates the constitutional rights of the plaintiffs by improperly restricting their access to the political process. *White*, 412 U.S. at 766, 93 S.Ct. 2332; *Whitcomb*, 403 U.S. at 143, 91 S.Ct. 1858. The plaintiffs have discharged the burden of proof as required by *Whitcomb*.

This court reaches its conclusion by collating the evidence produced and the law propounded by the federal appellate courts. The controlling law of this Circuit was enunciated by Judge Gewin in *Zimmer*, which closely parallels *Whitcomb* and *White*.[25] The *Zimmer* court, in an en banc hearing, set forth four primary and several "enhancing" factors to be considered when resolving whether there has been impermissible voter dilution. The primary factors are:

"... a lack of access to the process of slating candidates, the unresponsiveness of legislators to their particularized interests, a tenuous state policy underlying the preference for multi-member or at-large districting, or that the existence of past discrimination in general precludes the effective participation in the election system, a strong case [for relief] is made." *Zimmer* at 1305. [footnotes omitted].

The enhancing factors include:

"a showing of the existence of large districts, majority vote requirements, anti-single shot voting provisions and the lack of provision for at-large candidates running from particular geographical subdistricts." *Zimmer* at 1305 [footnotes omitted].

1. LACK OF OPENNESS IN THE SLATING PROCESS OR CANDIDATE SELECTION PROCESS TO BLACKS.

Any person interested in running for school commissioner is able to do so.

The system at first blush appears to be neutral, but consideration of facts beneath the surface demonstrate the *effects* which lead the court to conclude otherwise. No black has ever been elected school commissioner in Mobile County. The evidence indicates that black politicians who have previously been candidates in at-large elections and would run again in the smaller single-member districts, shy away from county at-large elections. One of the principal reasons is the polarization of the white and black vote. The court is concerned with the effect of lack of openness in the electoral system in determining whether the multi-member at-large election system of the school commissioners is invidiously discriminatory.

In *White*, the Supreme Court expressed concern with any type of barrier to effective participation in the political process. *Zimmer*, 485 F.2d at 1305, n. 20, expressed its view in this language: "The standards we enunciate today are applicable whether it is a specific law or custom or practice which causes diminution of minority voting strength."

There is a lack of openness to blacks in the political process in the school commissioners' election.

2. UNRESPONSIVENESS OF THE ELECTED SCHOOL COMMISSIONERS TO THE BLACK MINORITY.

It is the conclusion of the court that the countywide elected school commissioners as practiced in Mobile County has not, and is not, responsive to blacks on an equal basis with whites; hence there exists racial discrimination. Past school boards have not only acquiesced to segregated folkways, but the County School Board has been in federal court continuously since 1963 to effect

**25.** See also *Paige v. Gray*, 538 F.2d 1108 (5th Cir. 1976).

meaningful desegregation. *Davis v. Mobile County School Board*, Civil Action No. 3003–63 (S/D Ala.). During the course of this court's continuing jurisdiction in *Davis*, there have been 15 or more appeals to the Fifth Circuit. As hereinbefore set out, the Board has been repeatedly guilty of dilatory practices and it cannot justly claim credit for the improvement of the school system today since they are operating under a court order and the watchful eye of the court in the implementation of that order.[26]

There has been a lack of responsiveness in employment and the operation of a dual school system. The disestablishment of that system and the establishment of a unitary system has been significantly slow. It is this court's opinion that leadership should be furnished in non-discriminatory hiring and promotion by our government, be it local, state, or federal.[27]

### 3. NO TENUOUS STATE POLICY SHOWING A PREFERENCE FOR AT–LARGE DISTRICTS.

The Alabama legislature has offered little evidence of a preference one way or the other for multi-member or at-large districts in its counties. This court finds state policy regarding multi-member at-large districting as neutral.

### 4. PAST RACIAL DISCRIMINATION.

It is this court's opinion that fair and effective participation under the present electoral system is, because of its structure, difficult for the black citizens of Mobile County. Past discriminatory customs and laws that were enacted for the sole and intentional purpose of extinguishing or minimizing black political power is responsible. The purposeful excesses of the past are still in evidence today. Indeed, Judge Rives, writing for a three-judge panel finding the Alabama poll tax to be unconstitutional, stated forcefully:

> " 'The long history of the Negroes' struggle to obtain the right to vote in Alabama has been trumpeted before the Federal Courts of this State in great detail. * * If this court ignores the long history of racial discrimination in Alabama, it will prove that justice is both blind and deaf.' We would be blind with indifference, not impartiality, and deaf with intentional disregard of the cries for equality of men before the law." *U. S. v. State of Alabama*, 252 F.Supp. 95, at 104 (M.D.Ala. 1966), [citing *Sims v. Baggett*, 247 F.Supp. 96, 108–09 (M.D.Ala.1965)].

Without question, past discrimination, some of which continues to today as evidenced by the orders in several lawsuits in this court against the city and county, and demonstrated in the lack of access to the selection process and the school commissioners' unresponsiveness, contributes to black voter dilution.

### 5. ENHANCING FACTORS.

*Zimmer*, in addition to enumerating four substantial criteria in proving voter dilution, listed four "enhancing factors" that should be considered as proof of aggravated dilution.

---

**26.** All members of the school board just prior to the November 1976 election resided in metropolitan Mobile. Four members of the school board presently reside in metropolitan Mobile. There have been orders from this court against the City of Mobile or its departments to desegregate the police department, the golf course, public transportation, the airport, and an order affecting the City and County which attack racial discrimination, to wit, the *Allen, Anderson, Sawyer, Evans*, and *Cooke, supra*, cases.

**27.** *McLaughlin, etc. v. Callaway et al.*, 382 F.Supp. 885, at p. 895 (S.D.Ala.1974):

"It is only fitting that the government take the lead in the battle against discrimination by ferreting out and bringing an end to racial discrimination in its own ranks."

Mobile has no ordinances proclaiming equal employment opportunity, either public or private, to be its policy. There are no non-discriminatory rental ordinances. On the one hand, the federal courts are often subjected to arguments by recalcitrant state and local officials of the encroachment of the federal bureaucracy and assert Tenth Amendment violations—while making no mention that were it not for such "encroachment" citizens would not have made the progress they have to fulfillment of equal rights. Recent history bears witness to this proposition.

a. *Large Districts.* The present at-large election system is as large as possible, i. e., the county. The county, with an area of 1,240 square miles and 317,308 persons, according to the 1970 Census, can reasonably be divided into election districts. It is common knowledge that numerous counties in the State have countywide officers such as county commissioners, divided into single-member districts and function reasonably well. It is large enough to be considered large within the meaning of this factor.

b. *Majority Vote Requirements.* There is a majority vote requirement for primary elections, Title 17, Sec. 366, *Code of Alabama* (1958). There is no such requirement in the general election. Very rarely, if ever, have more than two persons opposed one another in a general election. As a practical matter, in the past, the effects of a majority vote have prevailed.

c. *Anti-single Shot Voting.* There is no anti-single shot voting provision in the present system of electing members of the Board. The Board members do run for a numbered place, Title 17, Sec. 153(1), *Code of Alabama* (1958). This place provision has to some extent the same result as the anti-single shot voting provision. At least in part, the practical results of an anti-single shot provision obtains in Mobile County.

d. *Lack of Residency Requirement.* The present system of election of the Board members does not contain any provision requiring that any commissioner reside in any specific district or one geographical area of the county.

### IV.

The court has made a finding for each of the *Zimmer* factors, and most of them have been found in favor of the plaintiffs. The court has analyzed each factor separately, but has not counted the number present or absent in a "scorekeeping" fashion.

The court has made a thoughtful, exhaustive analysis of the evidence in the record ". . . pay[ing] close attention to the facts of the particular situations at hand," *Wallace*, 515 F.2d at 631, to determine whether the minority has suffered an un-

constitutional dilution of the vote. This court's task is not to tally the presence or absence of the particular factors, but rather, its opinion represents ". . . a blend of history and an intensely local appraisal of the design and impact of the Bexar County multi-member district [under scrutiny] in light of past and present reality, political and otherwise." *White*, 412 U.S. at 769–70, 93 S.Ct. at 2341.

The court reaches its conclusion by following the teachings of *White, Dallas v. Reese*, 421 U.S. 477, 480, 95 S.Ct. 1706, 44 L.Ed.2d 312 (1975), *Zimmer, Fortson*, and *Whitcomb* et al.

The evidence when considered under these teachings convinces this court that the at-large districts "operate to minimize or cancel out the voting strength of racial or political elements of the voting population." *Whitcomb*, 403 U.S. at 143, 91 S.Ct. at 1869, and *Fortson*, 379 U.S. at 439, 85 S.Ct. 498, and "operates impermissibly to dilute the voting strength of an identifiable element of the voting population,". *Dallas*, 421 U.S. at 480, 95 S.Ct. at 1708. The plaintiffs have met the burden cast in *White* and *Whitcomb* by showing an aggregate of the factors cataloged in *Zimmer*.

In summary, this court finds that the electoral structure, the multi-member at-large election of Mobile County School Commissioners, results in an unconstitutional dilution of black voting strength. It is "fundamentally unfair", *Wallace*, 515 F.2d at 630, and invidiously discriminatory.

■ The Supreme Court has laid down the general principle that "when district courts are forced to fashion apportionment plans, single-member districts are preferable to large multi-member districts as a general matter." *Connor v. Johnson*, 402 U.S. 690, 692, 91 S.Ct. 1760, 1762, 29 L.Ed.2d 268 (1971). The Court reaffirmed this twice in the last term. *East Carroll Parish School Board*, and *Wallace, supra*. Once the racial discriminatory evil has been established, as it was in *White*, the dilution occasioned by the multi-member at-large election requires the disestablishment of the multi-member

at-large election and the obvious remedy is to establish single-member districts.

This court does not endorse the idea of quota voting or elections, nor of a weighted vote in favor of one race to offset racial prejudice or any other adversity. However, when the electoral structure of the government is such, as in this case, that racial discrimination precludes a black voter from an effective participation in the election system, a dilution of his and other black votes has occurred.

The moving spirit present at the conception of this nation, "all men are created equal," will not rest and the great purpose of the Constitution to "establish Justice, insure domestic Tranquility, . . . and secure the Blessings of Liberty to ourselves and our Posterity . . . ." will be only a dream until every person has an opportunity to be equal. To have this opportunity, every person must be treated equally. This includes being treated equally in the electoral process.

A county school commissioner election plan which includes small single-member districts will provide blacks a realistic opportunity to elect blacks to the Board of School Commissioners. No such realistic opportunity exists as the Board is presently structured. A single-member district plan would afford such an opportunity. Blacks' effective participation in the elective system will have the salutary effect of giving them a realistic opportunity to get into the mainstream in the operation of Mobile's school system which has a ratio range of 55/45 to 60/40, white/black students. It will give them an opportunity to have an imput and impact on the educational system. Good quality education equally available to all, (with the people having a compassionate concern, love, for one another) probably affords the best hope for a strong democracy and the sharing of this nation's economic and social benefits. It will afford an opportunity for a more meaningful dialogue between the whites and blacks to develop.

## V.

There is a traditional constitutional tolerance of various forms of local government. See, e. g., *Abate v. Mundt*, 403 U.S. 182, 185, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971).

The court recognizes the "delicate issues of federal-state relations underlying this case." *Mayor of the City of Philadelphia v. Educational Equality League*, 415 U.S. 605, at 615, 94 S.Ct. 1323, 1331, 39 L.Ed.2d 630.

The single-member districts have advantages other than correcting constitutional differences as found in this decree.[28]

---

**28.** *Dove et al. v. Moore et al.*, 539 F.2d 1152, 1154 (8th Cir. 1976), set out in footnote 3:

"The author has previously discussed at length the undesirable characteristics of at-large elections and the benefits of single-member districts. *Chapman v. Meier*, 372 F.Supp. 371, 388–94 (D.N.D.1974) (three-judge court) (Bright, J., dissenting), *majority reversed*, 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975). In the context of a discussion of proposed plans for the reapportionment of a state legislature, the dissent emphasized the following benefits of single-member districts: (1) It gives a voter a chance to compare only two candidates, head to head in making a choice.

(2) It prevents one political party with a heavy plurality in one or two potential districts from dominating other potential districts that might narrowly go for the candidate of the opposite party.

(3) It prevents a city wide political organization from ostracizing or disciplining a legislator, who dares stray from the machine's line.

(4) It permits a citizen to identify a legislator as his senator and makes direct communication easier.

(5) It makes each senator responsible for his actions and makes it difficult for a senator to fade into the ranks of "the team" to avoid being identified with specific actions taken.

(6) It reduces campaign costs and "personalizes" a campaign.

(7) It creates greater interest in the possibility of a citizen seeking a legislative seat without the political machine blessing.

(8) It would diminish the animosity created in the legislature against multi-senate districts because of the tendency of senators elected by one political party from a city to vote as a bloc.

(9) It would tend to guarantee an individual point of view if all senators are not elected as a team.

(10) It would equalize the power of people in single senate districts with the people in the broken down multi-senate districts to *influence* the election of only one senator.

[372 F.Supp. at 391 (footnote omitted) (emphasis in original).]

The court hereby adopts the plan, including the map designating the districts, submitted by the plaintiffs and attached as "Appendix B" and is part of this decree the same as if set out at length herein. This plan divides the county into five single-member districts. The lines are drawn along traditional precinct lines which will minimize voting conflicts. There is a maximum population variation in the districts of 6.3%.

The court has stated repeatedly to the parties that it felt constrained to tinker with the present size of the membership and other features of the existing method of election as little as possible, i. e., require only that which is necessary to meet the constitutional mandates of this decree.

The Commissioners for Districts 3 and 4 will be elected in 1978. The Commissioner for District 5 will be elected in November, 1980. The commissioners for Districts 1 and 2 will be elected in November, 1982. The commissioners will take office on the date as provided by the laws of the State of Alabama.

As the single-member districts are elected in the future, each school commissioner shall have been a resident of the district which that person represents for not less than 12 months immediately preceding that person's election and shall reside in the district during that person's term of office. All other qualifying and eligibility requirements should be that as provided by the laws of the State of Alabama. All other laws of the State of Alabama as apply to the Mobile County School System not in conflict with this order shall govern.

The Board since 1919 has been made up of five members. Various proposals have been made to enlarge the membership and designate when the new members should be elected. It is the court's considered judgment that changes made by the court should be minimal and only to correct constitutional deficiencies. For these reasons, the number of the members of the Board, the length of the term of office, and the staggered office terms and election, except as modified herein, are to remain as provided by the legislature.

The plaintiffs desired a hearing far enough in advance of the November election for the court to make a decision, and if single-member districts were provided, that a special election be held prior to the 1976 general election with the winners of the various party elections being placed on the November general election ballot. If this was not done, they requested a special election be called after the general election.

The defendants desired that all elected members of the Board be allowed to serve out their respective terms until vacancies were created in sufficient number to fill the single-member districts predominantly populated by black voters.

Due to the time problems created by the dismissal, and later adding the school commissioners as defendants, the defendants would not have had sufficient time to prepare their defense, and the court would have been unable to make a reasoned judgment for elections to be held in 1976.

The court is unwilling to put the taxpayers to the expense of special elections, and the court is unwilling to deny the blacks the relief they are entitled to until 1980, a period of four years. The court is desirous of mitigating the adjustment and seeing that each elected member on the Board serves the longest possible period of time.

During the course of the trial, the court was advised by these defendants that they were interested in implementing a single-member district plan, shortening the litigation and reducing the expenses. They requested an opportunity for the defendants and plaintiffs to negotiate a compromise settlement. The parties indicated they desired some guidelines from the court concerning when the election of single-member representatives would take place, and, if any of the elected members' terms would be shortened, which one. The court stated in substance the above election schedule and stated it appeared equitable to the court that if any member's terms were shortened,

it should be those who had the least remaining time of service remaining on their six year term.

This approach continues to be the view of the court as an equitable solution. The present board members who will have the least remaining time of service, or who will have served most of their elected term at the time of the 1978 elections, will be Board members Alexander and Drago.

Under the ordered single-member district plan which requires residence in the district which the commissioner represents, the present Board members now reside in the districts as follows:

Commissioners Bosarge, Alexander, and Berger in District 2.

Commissioner Sessions in District 4.

Commissioner Drago in District 5.

No one resides in District 3 which has a majority black population and is entitled to a commissioner in 1978. Commissioner Sessions resides in District 4 which has a majority black population and is entitled to a place in 1978. Commissioner Sessions' term expires in 1978 and there will automatically be a vacancy for that district at that time.

In order for District 3 to have a place, one other Board member's term must be shortened or modified. Proceeding on the premises above stated of shortening or modifying members' terms who had the least remaining time of service, the choice narrows to Commissioners Alexander and Drago.

It appears more equitable to the court to modify one commissioner's powers and duties and allow that commissioner to complete his term rather than shorten it. For the remaining four commissioners, presently in office, after 1978, to complete their currently elected terms with new commissioners to be elected for Districts 3 and 4 in 1978, would make a Board consisting of six members. A six member board would lend itself to possible tie votes of three to three. The Board could be rendered ineffective under such conditions.

Should one of the places held by a commissioner other than Commissioner. Sessions, whose place will not be open for election in 1978, become vacant prior to the time required by the laws of the State of Alabama for qualifying for the November, 1978, election, that place will not be filled by election prior to November, 1980, but will be occupied by either Commissioner Alexander or Drago until the expiration of the period of the present term they are now serving.

In the event there is not a vacancy in one of the present places as above set out, the Board, by a majority vote on or before one month prior to the general election in 1978, shall elect a Chairman or President (Chairman) of the Board, and immediately report the results of the election to this court, to serve to the end of the term in 1980 for which that person has been elected. The Chairman to be elected is to be either Commissioner Alexander or Commissioner Drago, the two members of the present Board with the least remaining years of service in their elected term. Their present terms expire after the general election in November, 1980.

Since Commissioner Drago's term expires at that time and her place would ordinarily be up for election in the general election of November, 1980, her successor will be elected from District 5 in the general election of 1980. Commissioner Drago will serve to the end of the term for which she has been elected and until her successor has been elected, qualified, and taken office according to the laws of Alabama. Since Commissioner Alexander resides in District 2, and Commissioners Bosarge and Berger live in District 2, no vacancy will exist in that district in 1980. Commissioner Alexander will serve until the end of the term in 1980 to which he was elected in 1974.

The Chairman elected under this order will have all the powers the Chairman would have under the law, rules, and regulations the Chairman is now governed by except the right to vote. For this two year period of time only, 1978 to 1980, the Chair-

man will have the right to vote only in the event of a tie vote which could be occasioned by abstention, absence, or any other reason. After the 1980 election, the Board will have only five members and this provision with reference to the Chairman will no longer apply.

It is therefore ORDERED, ADJUDGED, and DECREED that there shall be elected in November, 1978, school commissioners from Districts 3 and 4; there shall be elected in November, 1980, a school commissioner for District 5; and there shall be elected in November, 1982, school commissioners from Districts 1 and 2.[29]

It is further ORDERED, ADJUDGED and DECREED that whenever there shall be a change in any of the five districts heretofore established, evidenced by a federal census of population published following a federal census hereafter taken, there shall be a reapportionment of the school commissioner districts in the manner hereinafter provided.

(1) The school commissioners shall within six months after the publication of each decennial federal census of population for the county, commencing with the 1990 census, file with this court a report containing a recommended plan for the reapportionment of the school commissioner boundaries to comply with the following specifications:

(a) Each district shall be formed of contiguous and to the extent reasonably possible, compact territory, and its boundary lines shall follow State Senate and House district lines, ward or precinct lines, to the maximum extent possible and other boundary lines shall be the center lines of streets or other well defined boundaries.

(b) Each district shall contain as nearly as is reasonable, the same population.

(2) The report shall include a map and description of the districts.

(3) The provisions of the 1965 Voting Rights Act shall be complied with.

(4) The school commissioners shall comply with any other United States Congressional legislation relating to this subject matter and in compliance with the United States constitutional law.

(5) Upon compliance with the above provisions, the redistricting should become effective.

(6) Such redistricting shall not apply to any regular or special election held within six months after its becoming effective. No incumbent member of the Board shall be deprived of his unexpired term of office because of such redistricting.

It is further ORDERED, ADJUDGED and DECREED that the defendants, John L. Moore, individually and in his official capacity as Probate Judge of Mobile County; John E. Mandeville, individually and in his capacity as Court Clerk of Mobile County; Thomas J. Purvis, individually and in his official capacity as Sheriff of Mobile County, Robert R. Williams, Dan C. Alexander, Jr., Norman J. Berger, Ruth F. Drago, Homer L. Sessions, individually and in their official capacities as School Commissioners of Mobile County, Alabama; the Board of School Commissioners of Mobile County, Alabama, and Mobile County, Alabama, their agents, servants, employees, and successors, are hereby ENJOINED from failing to:

(1) Redistrict as set out above.
(2) Make and hold the elections as redistricted.

The defendant Board of School Commissioners and Mobile County are taxed with the costs, including attorneys' fees.

Within 30 days from this date, the attorneys for the plaintiffs are to file affidavits setting forth their claim for attorneys' fees, including hours worked and hourly charges. The defendants, School Board Commissioners and Mobile County, are to be sent a copy of this claim and these defendants may object in writing within 15 days.

This court retains jurisdiction for the implementation of this order.

---

**29.** All the Districts to be as described in Appendix B.

"APPENDIX A"

ORDER ON DEFENDANT BOARD OF SCHOOL COMMISSIONERS' MOTION TO SEVER AND DISMISS OR CONTINUE

The defendant's motion to sever is hereby DENIED.

The defendant's motion to dismiss is hereby DENIED.

The defendant's motion to continue in order to give the Legislature of the State of Alabama an opportunity to act on a proposed redistricting is hereby DENIED.

The complaint was filed June 9, 1975. The defendant's attention is directed to a conference with the attorneys for the Board of School Commissioners, the County Commissioners, and the City Commission of the City of Mobile, in open court on July 14, 1976. The long delay of the defendant in answering the complaint making the School Board, et al., defendants a second time, was called to the attention of the attorney for the defendant School Board.

It was at the request of the defendant School Board that a continuance was granted of the trial of their case at that time, although there were mitigating court scheduling problems.

It was common knowledge at that time that a proposed redistricting plan had been passed at a previous session of the Legislature but later declared unconstitutional. It was common knowledge there was pending in the State Legislature which was then in session a redistricting plan. The court specifically advised counsel for all the parties that the court would not be disposed to further delay the trial or decision after the September, 1976, setting, and if any, or all of the defendants, anticipated seeking changes in the makeup or districting of their respective Commissions or Boards, they should take action while the Legislature was then in session. Due to the age of this case, and the Legislature having had two opportunities to act during its pendency, additional delays are not justified.

Done, this the 7th day of September, 1976.

s/ Virgil Pittman
UNITED STATES DISTRICT JUDGE

"APPENDIX B"

Analysis of Plaintiffs' Plan for School Board

| District | Ward/Precinct | Population | % Black VAP | Weighted Black Pop. |
|---|---|---|---|---|
| 1 | 100–4 | 7,760 | .006 | 46 |
|  | 101–1 | 7,310 | .007 | 51 |
|  | North | 37,665 |  | 7,514 |
|  | West | 12,851 |  | 1,538 |
|  |  | 65,585 |  | 9,149 |
|  |  |  |  | 13.9% |
| 2 | 104–5 | 4,767 | .02 | 95 |
|  | South | 34,924 |  | 5,148 |
|  | 100–1 | 3,122 | .05 | 156 |
|  | 100–2 | 2,078 | .08 | 166 |
|  | 100–3 | 7,007 | .22 | 1,542 |
|  | 101–3 | 5,520 | .004 | 22 |
|  | 101–2 | 4,196 | .026 | 109 |
|  |  | 61,614 |  | 7,238 |
|  |  |  |  | 11.7% |
| 3 | Prichard | 41,578 |  | 21,005 |
|  | 98–1 | 9,438 | .66 | 6,286 |
|  | 99–1 | 12,709 | .91 | 11,565 |
|  |  | 63,725 |  | 38,856 |
|  |  |  |  | 61.0% |

| | | | | |
|---|---|---|---|---|
| 4 | 99–2 | 8,664 | .954 | 8,265 |
| | 99–3 | 4,510 | .906 | 4,086 |
| | 99–4 | 5,536 | .997 | 5,519 |
| | 103–1 | 8,946 | .995 | 8,901 |
| | 108–2 | 4,672 | .465 | 2,172 |
| | 103–3 | 8,903 | .636 | 5,662 |
| | 102–2 | 4,896 | .03 | 147 |
| | 102–3 | 4,244 | .01 | 42 |
| | 103–4 | 11,419 | .026 | 297 |
| | | 61,790 | | 35,091 |
| | | | | 56.8% |
| 5 | 102–4 | 2,704 | .003 | 8 |
| | 102–6 | 5,280 | .043 | 227 |
| | 102–7 | 3,872 | .785 | 3,040 |
| | 102–1 | 4,793 | .22 | 1,054 |
| | 102–5 | 6,914 | .000 | 0 |
| | 101–4 | 5,833 | .074 | 432 |
| | 104–1 | 8,091 | .117 | 947 |
| | 104–2 | 3,514 | .07 | 246 |
| | 104–3 | 8,410 | .067 | 563 |
| | 104–4 | 6,029 | .008 | 48 |
| | 101–5 | 5,664 | .074 | 419 |
| | 101–6 | 3,489 | .074 | 258 |
| | | 64,593 | | 7,242 |
| | | | | 11.2% |

Sources: figures compiled by Tony Parker for regression analysis

The maximum variation between the largest and smallest district is 6.3%. The variance from the optimum is 3.15%.

The mean is 63,461.6 per district.